

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-20-00051-CR

_____

HARRY HOLLEY, II, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 16th District Court
Denton County, Texas
Trial Court No. F18-1728-16

---

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

## I. Introduction

Appellant Harry Holley II was in his late thirties in April 2018 when he admitted that he had sexually abused the then-11-year-old complainant, M.R., and admitted that her accusations and descriptions were accurate during a recorded interview with Department of Public Safety Deputy William Buford.

Not quite two years later, during trial, Holley testified that he had lied to Deputy Buford, claimed that he had never sexually abused M.R., and attempted to distinguish between having eczema on his penis (which M.R. had described and which he said he did not have) and eczema on his crotch (which he agreed he had). During his trial testimony, Holley also claimed that he had lied when he told Deputy Buford that M.R. had asked for and initiated their sexual contacts and that he had told her to suck his penis "like a lollipop."

The jury assessed Holley's credibility through his testimony and through the portions of the audio recording of his interview with Deputy Buford that were published during the trial. The jury also considered the testimonies of M.R., Deputy Buford, the sexual assault nurse examiner (SANE nurse) who conducted an exam on M.R., the forensic interviewer who questioned M.R. about the alleged offenses, the sheriff's office investigator, some Child Protective Services workers, Holley's brother, and M.R.'s school counselor. M.R.'s school counselor testified that M.R. had told her, "I'm eleven and I don't want to do that," and then "something about him trying to

2

put his thing in her," which had led the school counselor to contact CPS. The jury deliberated for less than 90 minutes before finding Holley guilty of continuous sexual abuse of a young child, a first-degree felony offense.[1] The jury deliberated for an hour before assessing his punishment at confinement for life. *See* Tex. Penal Code Ann. § 21.02(b), (h).

In four issues, Holley appeals, arguing that the trial court abused its discretion by admitting three items of evidence and by denying his motion for continuance. In an unnumbered issue, he also argues that the cumulative effect of these errors made it impossible for him to receive a fair trial. We affirm.

## II. Discussion

Holley complains that the trial court abused its discretion by allowing evidence during guilt-innocence (1) of an alleged bad act; (2) about his flight; and (3) by allowing two outcry witnesses to testify about the same incident. He also complains that the trial court abused its discretion by denying his motion for continuance, asserting that this rendered his defense counsel ineffective.

---

[1]Holley was charged with having committed continuous sexual abuse of a child by, during a period that was 30 days or more in duration, committing two or more acts of sexual abuse of M.R., a child younger than 14 years of age, by touching M.R.'s genitals or causing her to touch his genitals with the intent to arouse or gratify his sexual desire, by intentionally or knowingly causing M.R.'s mouth to contact his sexual organ, and/or by intentionally or knowingly causing M.R.'s sexual organ to contact his sexual organ. The jury charge included aggravated sexual assault of a child and indecency with a child as lesser-included offenses.

## A. Standard of Review and Harm

We review a trial court's decision to admit evidence for an abuse of discretion. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018). Under this standard, we will uphold the trial court's decision as long as it was within the "zone of reasonable disagreement." *Id.* We likewise review the denial of a motion for continuance for an abuse of discretion. *Gonzales v. State*, 304 S.W.3d 838, 844 (Tex. Crim. App. 2010). These are nonconstitutional errors that fall under Rule of Appellate Procedure 44.2(b), which requires us to disregard any nonconstitutional errors that do not affect the appellant's substantial rights. *See* Tex. R. App. P. 44.2(b).

An error that has a "substantial and injurious effect or influence in determining the jury's verdict" affects a substantial right. *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). In determining the likelihood that a nonconstitutional error adversely affected the jury's decision, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex.

4

Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Haley*, 173 S.W.3d at 518–19; *Motilla*, 78 S.W.3d at 355–56.

## B. Alleged Bad Act

The trial court allowed the prosecutor to ask Holley and his brother about an alleged bad act by Holley that occurred over two decades before trial with a female relative who had been around the same age as M.R.[2] Holley argues that the trial court abused its discretion by allowing the alleged bad act into evidence during the guilt-innocence phase of trial, referring us to Code of Criminal Procedure Article 38.37[3]

---

[2]Holley revealed in his interview with Deputy Buford that he had been 16 or 17 years old when he asked a seven-year-old female relative to suck his penis. During his testimony, however, Holley denied that he had done any such thing and said that he had made up that story when he spoke with Deputy Buford.

[3]The State points out that Holley refers us only to Section 1 of Article 38.37 and ignores the provisions under Article 38.37, Section 2. While Section 1 pertains to evidence of other crimes, wrongs, or acts committed by the defendant against the child who is the victim of the alleged offense to illustrate the state of mind of the defendant and the child and their previous and subsequent relationship, *see* Tex. Code Crim. Proc. Ann. art. 38.37, § 1(a)–(b), Section 2 of the same article states, in pertinent part, that notwithstanding Rule of Evidence 404, evidence that a defendant has committed a *separate* sexual offense against a child may be admitted in a sexual-offense-against-a-child trial "for any bearing the evidence has on relevant matters," including the defendant's character and his conformity therewith as long as the trial court holds a hearing outside the jury's presence before that evidence is introduced. *See id.* §§ 2(b), 2-a; *see also Perez v. State*, 562 S.W.3d 676, 686–87 (Tex. App.—Fort Worth 2018, pet. ref'd) (holding that Section 2 of Article 38.37 is constitutional).

and Texas Rules of Evidence 402, 403, and 404(b).[4] The State responds that Holley has waived these arguments and that any error was harmless.

A complaint made on appeal must comport with the complaint made in the trial court or the error is forfeited. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009) ("A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial."); *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) ("Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial.").

While prior to the publication of the interview with Deputy Buford, Holley's counsel stated, "We would voice our continued running objections, Your Honor," the referenced running objections granted by the trial court were as to hearsay in general and to Rule 403.[5] And the portion of the interview referencing the alleged bad act was not published to the jury.

---

[4]Rule 404(b) generally prohibits the admissibility of evidence of a crime, wrong, or other act to prove a person's character and his conformity therewith, but such evidence may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Tex. R. Evid. 404(b). Rule 402 defines relevant evidence as admissible unless otherwise prohibited by the federal or state constitution or by a statute or rule of evidence. Tex. R. Evid. 402. We address Rule 403 below.

[5]Holley's counsel phrased the objection as the evidence's "probative value['s] [being] outweighed by [its] prejudicial impact."

The next day, in a hearing outside the jury's presence, the prosecutor asked for permission to go into the alleged bad act during the defense's case. The trial court overruled Holley's Rule 403 objection that "the probative value is outweighed by the prejudicial impact." When the prosecutor questioned Holley about the alleged bad act, Holley's counsel objected again on the same ground. When the prosecutor questioned Holley's brother about the alleged bad act because he had also known the child in question, Holley's counsel made no objection, and Holley's brother denied any knowledge of the alleged bad act.

As pointed out by the State, Holley forfeited his Article 38.37 and Rule 402 and 404(b) arguments by failing to raise them in the trial court, and we overrule this portion of his first issue. However, as set out below, to the extent that Holley preserved his Rule 403 complaint, the trial court did not abuse its discretion by allowing the prosecutor to ask him and his brother about the alleged bad act because the evidence was not so prejudicial that it likely deprived him of a fair trial. *See Perez*, 562 S.W.3d at 688; *see also* Tex. R. App. P. 44.2(b); *Solomon*, 49 S.W.3d at 365.

When a Rule 403 objection is made, the trial court must engage in a balancing test and consider how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable; the potential that the extraneous offense will impress the jury in some irrational but indelible way; the amount of trial time that the proponent uses to develop evidence of the extraneous offense; and the proponent's need for the extraneous offense evidence. *Perez*, 562 S.W.3d at 689–90.

7

Remoteness is also a factor that we must consider, as a substantial gap in time between the occurrence of the extraneous offense—especially one in which a final conviction was not obtained—and the charged offense will weaken the extraneous-offense evidence's probative value, especially if there is no evidence of any intervening misconduct. *Id.* at 690.

Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence is more probative than prejudicial. *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991) (op. on reh'g). It is the burden of the party opposing the evidence's admission to overcome this presumption by showing that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice or by the other dangers listed in Rule 403. *Wells v. State*, 558 S.W.3d 661, 669 (Tex. App.—Fort Worth 2017, pet. ref'd); *Sanders v. State*, 255 S.W.3d 754, 760 (Tex. App.—Fort Worth 2008, pet. ref'd). Further, evidence is not excludable under Rule 403 if it is merely prejudicial because "all evidence against a defendant is . . . designed to be prejudicial." *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013); *see* Tex. R. Evid. 403. Rather, Rule 403 is concerned with evidence that is *unfairly* prejudicial. Tex. R. Evid. 403; *Pawlak*, 420 S.W.3d at 811.

Holley raised Rule 403 in response to the prosecutor's argument that the alleged bad act was relevant and admissible under Article 38.37. The alleged bad act—which had occurred over 20 years before—was similar to some of the same conduct that Holley was accused of engaging in with M.R., but it was unlikely to

8

impress the jury in an irrational but indelible way in light of the admissions Holley had already made during his interview with Deputy Buford regarding his actual actions with M.R. Other evidence—testimony from M.R. and from the forensic interviewer and SANE nurse—corroborated Holley's statements to Deputy Buford and further minimized any unfairly prejudicial effect of introducing the alleged bad act.

Furthermore, the alleged bad act was used only briefly during the cross-examination of Holley and his brother during the defense's case and consisted of only a few questions of Holley[6] and a single question during Holley's brother's testimony. Given the exceedingly brief amount of time during trial that the prosecutor used to develop the alleged bad act, and Rule 403's presumption that relevant evidence is more probative than prejudicial, *see Montgomery*, 810 S.W.2d at 389, we cannot say that the trial court abused its discretion by finding the balance weighed, even slightly, in favor of admitting the alleged bad act when it was not so prejudicial as to deprive Holley of a fair trial. *See Perez*, 562 S.W.3d at 688–90. We therefore overrule the remainder of his first issue.

## C. Flight

Outside the jury's presence, the prosecutor offered State's Exhibits 9, 10, and 11 in support of her request to go into evidence of Holley's flight before the jury.

---

[6]The prosecutor asked Holley if he remembered telling Deputy Buford that he had asked the seven-year-old relative to suck his penis, and he answered, "Yes, ma'am." Holley then denied having actually asked his relative to do this and said that he made it up when he spoke with Deputy Buford.

9

State's Exhibit 9 is a certified copy of the court-setting slip in the instant case, signed by the prosecutor, defense counsel, and Holley on October 29, 2019, and showing that the case was set for a docket call on January 17, 2020, and for jury trial on January 27, 2020. State's Exhibit 10 is a certification of call in this case, showing that Holley failed to appear at the January 17, 2020 docket call. State's Exhibit 11 is a certified copy of the capias (warrant for his arrest) that issued when Holley failed to appear at the docket call, the return of which shows that Holley was arrested three days later.

During the hearing outside the jury's presence, a Denton County District Attorney's Office investigator testified that the court-setting slip constituted an order for Holley to attend court on January 17 and January 27; that the certification of call established that Holley had failed to appear on January 17 and authorized issuance of a warrant for his failure to appear; and that the capias and return showed that Holley was arrested three days later. The trial court concluded that the circumstances of Holley's flight were connected to the offense for which he was on trial and relevant as bearing on his possible guilt and allowed the State to present this evidence to the jury.

During the hearing outside the jury's presence, and before the trial court admitted the evidence of flight before the jury, Holley's counsel objected that the evidence was "irrelevant, immaterial," and that "its probative value is greatly outweighed by [its] prejudicial impact."

In his second issue, Holley argues that the trial court abused its discretion by allowing the flight exhibits and testimony into evidence during the guilt-innocence

10

phase of trial because there was no evidence that he had left the state and because "[i]ssuance of a warrant does not in an[d] of itself mean flight," and "failure to appear at a court setting in and of itself does not indicate flight," but rather that he *potentially* fled. Holley refers us to Rule of Evidence 404(b) and argues that the evidence of his flight was "clearly more prejudicial than probative" and prevented him from receiving a fair trial.

It has long been the law in this state that criminal acts designed to reduce the likelihood of prosecution, conviction, or incarceration for the offense on trial are admissible under Rule 404(b) as showing "consciousness of guilt." *Ransom v. State*, 920 S.W.2d 288, 299 (Tex. Crim. App. 1996) (op. on reh'g); *see Devoe v. State*, 354 S.W.3d 457, 470 (Tex. Crim. App. 2011) (explaining that flight is admissible as a circumstance from which an inference of guilt may be drawn); *see also Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) (citing *Fentis v. State*, 582 S.W.2d 779, 780–81 (Tex. Crim. App. 1976)); *Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994). Such evidence may include showing that the appellant forfeited his bail bond, *Logan v. State*, 510 S.W.2d 598, 600 (Tex. Crim. App. 1974), and showing his flight from custody or to avoid arrest. *Geeslin v. State*, 630 S.W.2d 512, 513–14 (Tex. App.—Fort Worth 1982, no pet.) (affirming conviction when appellant's sole complaint was that the trial court had abused its discretion by admitting testimony of a deputy district clerk to the effect that appellant had failed to appear for a court hearing, that his bond had been forfeited, and that a warrant had issued for his arrest).

To warrant admissibility, however, the evidence of flight must relate to the offense being prosecuted. *Bigby*, 892 S.W.2d at 883; *Guajardo v. State*, 378 S.W.2d 853, 856 (Tex. Crim. App. 1964) ("The [S]tate had the right to prove flight by appellant as evidence of his guilt. Proof that he failed to appear for trial and that his bond was forfeited was admissible as evidence tending to show flight."). To exclude such evidence under a relevance challenge, the burden shifts to the defendant to affirmatively show that the escape or flight was directly connected to some other transaction and, further, was not connected to the offense at trial.[7] *Bigby*, 892 S.W.2d at 883. Here, the State connected the evidence of flight through Holley's failure to appear at the docket call in the instant case, and Holley offered nothing to show that his failure to appear at the docket call was connected to some other transaction or was not connected to trial of the instant offense.

As pointed out by the State, evidence of Holley's flight was highly probative because it showed his consciousness of guilt of the charged offense through his failing to show up for docket call only 10 days before trial in the instant case. It also took little time to develop, and it was not unfairly prejudicial in light of all of the other evidence of Holley's sexual abuse of M.R. The State even concedes that, in light of

---

[7]Even if the defendant offers evidence that the flight might have arisen from some other cause, when its connection to the offense on trial remains a logical one, the evidence is still admissible and the defensive "other cause" evidence simply goes to the weight given to the evidence. *Hodge v. State*, 506 S.W.2d 870, 873 (Tex. Crim. App. 1974) (op. on reh'g).

the other evidence, its need for the flight evidence "was not high" but asserts that even if the evidence of flight was erroneously admitted, it was ultimately harmless because it did not affect Holley's substantial rights.

The State's evidence showed that Holley was aware of the date of the docket call and that he opted not to appear, and Holley offered nothing to explain his absence. The trial court did not abuse its discretion by concluding that the evidence was not substantially more prejudicial than probative, but even if it had, in light of Holley's admissions to Deputy Buford, which confirmed what M.R. had told her school counselor, the SANE nurse, and the forensic examiner, admission of the evidence of flight over Holley's objections was ultimately harmless.[8] *See Solomon*, 49 S.W.3d at 365. We overrule Holley's second issue.

---

[8]Flight was not mentioned during voir dire or during the prosecutor's opening statement (defense counsel reserved his opening statement). Other than during the cross-examination of Holley and his brother during the defense's case, the prosecutor only mentioned the flight evidence during her rebuttal closing argument in the context of Holley's cowardice, stating,

> The only thing I can think of that is worse than the actions that he did to her is by coming in here -- or rather talking to Agent Buford and saying she asked for it. An eleven-year-old child asked for it.
>
> *And then beyond that, couldn't even bother to show up. And then when he was literally brought here by law enforcement*, had the nerve to get on this stand, this same seat that this brave little girl sat on, that same stand, and tell you he made it all up. [Emphasis added.]

**D. Outcry**

Holley argues that the trial court abused its discretion by allowing two outcry witnesses to testify about the same incident.

Code of Criminal Procedure Article 38.072 provides an exception to the hearsay rule for testimony by outcry witnesses in cases involving sexual offenses against children under the age of 14, among others. Tex. Code Crim. Proc. Ann. art. 38.072. The exception applies only to statements made to the "first person, 18 years of age or older, other than the defendant, to whom the child . . . made a statement about the offense" if certain other statutory requirements are met. *Id.* The court of criminal appeals has interpreted "first person" to mean that the outcry witness must be the first person who is 18 years of age or older, "to whom the child makes a statement that in some *discernible* manner describes the alleged offense." *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990) (emphasis added); *see Espinoza v. State*, 571 S.W.3d 427, 431 (Tex. App.—Fort Worth 2019, pet. ref'd). The statement must be more than words that give a general allusion that something in the area of child abuse had occurred. *Garcia*, 792 S.W.2d at 91 (noting that the societal interest in curbing child abuse would not be served if all the first person had to testify to was to a general allegation from the child that something in the area of child abuse was going on at home).

Because of the way the statute is written, an outcry witness is not person-specific but rather event-specific. *Espinoza*, 571 S.W.3d at 431 (quoting *West v. State*,

14

121 S.W.3d 95, 104 (Tex. App.—Fort Worth 2003, pet. ref'd)). This means that multiple outcry witnesses may testify so long as they do not simply repeat the same event. *See Hines v. State*, 551 S.W.3d 771, 780 (Tex. App.—Fort Worth 2017, no pet.).

The State filed outcry-witness motions as to both M.R.'s school counselor and the forensic interviewer. Outside the jury's presence, the counselor stated that she had chosen to get a trained professional from CPS involved when M.R. told her what had happened to her and that she did not ask M.R. any follow-up questions after M.R. told her that Holley "[t]ried to put [that thing] in her" but did not tell her what the thing was or where he tried to put it. When questioned by defense counsel, the counselor stated that M.R. "came to [her] and said that he had tried to put something about the thing in her, and that she was eleven and didn't want to do that." The counselor said that she had understood M.R. to mean that someone had tried to penetrate her vagina with his penis.

The prosecutor explained to the trial court that the State had filed outcry notices on both the counselor and the forensic interviewer before meeting with the counselor and learning that she had not articulated a specific enough offense to be the outcry witness. The prosecutor said that the State's intention was to offer the forensic interviewer as the outcry witness because there were specific offenses articulated during the forensic interview.

Holley's counsel then replied, "Judge, our position is she did articulate an offense" and that the counselor was therefore the outcry witness. The prosecutor

15

replied, "[I]f the court is inclined to state that that is an outcry witness for sexual penetration of a sexual organ to sexual organ," through the counselor, then the State would still offer the forensic interviewer as an outcry witness for the other acts of sexual abuse that M.R. did not outcry to the counselor about. The trial court ruled that the counselor qualified as an outcry witness but that her testimony did not exclude the forensic interviewer as an outcry witness "as long as they're not simply providing cumulative testimony."

Before the jury, M.R.'s counselor testified, "[T]he things that I remember was the part about her being, [']I'm eleven and I don't want to do that.['] And something about him trying to put his thing in her." At that point, she contacted CPS.

Over Holley's hearsay and confrontation objections to her as an outcry witness, the forensic interviewer testified that M.R. had articulated specific, multiple acts of sexual abuse by Holley, including various sensory details. However, during the beginning of her testimony, when the forensic interviewer started to testify about Holley's having "done something bad," Holley's counsel objected, "I believe this is what the first outcry witness testified to," and the trial court sustained the objection.

Among other things, the forensic interviewer testified that M.R. had described Holley's penis ("thing") as "hairy" and having "a rash because he has eczema." M.R. told the forensic interviewer that Holley had squeezed her breasts and that her mouth had touched his penis and that "it tasted gross." M.R. also told her that Holley had licked his finger and moved it up and down on her vagina and that he tried to put "it

16

in her hole" but that she told him to stop. Holley did not object to this portion of the forensic interviewer's testimony.

It is unclear whether "it" in this context referred to Holley's penis or his finger. Immediately before this portion of the testimony, the prosecutor stated, "I wanted to specifically focus on his hands. Did [M.R.] talk about where his hands would end up?" The forensic interviewer then testified about Holley's having licked his finger and rubbed it on M.R.'s vagina and that M.R. had said that it hurt. The prosecutor's next question was, "And did she talk about that he tried to put it in her hole but she told him to stop?" After the forensic interviewer said, "Yes," the prosecutor then asked, "Did [M.R.] talk to you about another place on her body that . . . Holley touched with his hands?"

M.R. testified that Holley had only penetrated her vagina once with his penis. In his interview with Deputy Buford, Holley claimed that his penis had only touched M.R.'s vagina once. The SANE nurse testified, over Holley's hearsay objection, that M.R. told her that Holley "started sticking his thing in [her] thing, and it hurt. And [she] told him to stop." M.R. told the SANE nurse that Holley's "thing" was his penis and her "thing" was her vagina.

Holley complains that the school counselor and the forensic interviewer were allowed to "testify almost verbatim about the incident in April 2018" and that the forensic interviewer was allowed to do so "through vague questioning by the State." He asserts that they both "provided cumulative testimony to the more egregious of

the allegations" and thereby "caused substantial influence upon the guilty verdict and likely the length of punishment."

To the extent that the forensic interviewer and the school counselor testified about the same occurrence—and assuming, without deciding, that the school counselor's testimony amounted to more than a mere general allusion—we do not think that the error, if any, had more than a slight effect on the jury when the same testimony about the penis–vagina contact between Holley and M.R. came in through Holley's own admission in his recorded interview. *See* Tex. R. App. P. 44.2(b). Accordingly, we overrule his third issue.

## E. Continuance

In his final issue, Holley complains that the trial court abused its discretion by denying his motion for continuance and thereby caused him to receive ineffective assistance of counsel.

A trial court reversibly abuses its discretion only when the record shows that the defendant was prejudiced by the denial of his motion for continuance. *Gonzales*, 304 S.W.3d at 842–43; *Cooper v. State*, No. 02-15-00286-CR, 2016 WL 6123640, at *2 (Tex. App.—Fort Worth Oct. 20, 2016, pet. ref'd) (mem. op., not designated for publication). The denial of a continuance will not be a basis for an ineffective-assistance-of-counsel claim when the record reflects that the accused was ably represented. *Ex parte Windham*, 634 S.W.2d 718, 719–20 (Tex. Crim. App. 1982).

Holley argues that he was harmed by the trial court's denial of his continuance motion because during trial, his counsel "ask[ed] little or no[] questions of the State's witnesses" and presented no evidence with regard to Holley's whereabouts from January 17, 2020 to January 20, 2020, the period between his failure to appear at docket call and his arrest. Holley states, "Counsel d[id] not simply roll over and do nothing but [wa]s very limited by his lack of contact with appellant." Holley further complains, "By denying the motion for continuance, the trial court set into motion the wheels of justice. Those wheels then proceeded to run over the appellant."

We disagree. We think that the record reflects that Holley's counsel performed effectively in the bad situation into which Holley had put himself through Holley's own poor decision-making when counsel was appointed three days after Holley was interviewed by Deputy Buford.

### 1. Counsel's Activities Before the January 2020 Continuance Hearing

On June 12, 2018, Holley's counsel filed a motion to reduce Holley's bond in which Holley agreed to make all court appearances and to cooperate fully with any and all directives. A month later, the trial court reduced Holley's bond from $100,000 to $50,000 and required him to wear a GPS tracking device.

Holley's counsel filed a variety of motions on Holley's behalf over the course of the case. On September 26, 2019, Holley's counsel filed a first verified motion for continuance of the trial's November 4, 2019 setting because he had not yet received the DNA expert's report, among other reasons. The trial court granted the motion,

19

and on October 29, 2019, Holley's jury trial was set for January 27, 2020. Holley and his counsel both signed the setting information, which included the January 17, 2020 docket call date.

On December 13, 2019, Holley's attorney filed his second verified motion for continuance, complaining that Holley would not cooperate with him and had refused to show up for appointments, to take or return phone calls, or to respond to the letters and emails that had been sent to him.

## 2. The January 2020 Continuance Hearing

At the January 15, 2020 hearing on the second motion for continuance, Holley's counsel explained to the trial court that the last time he had been able to talk with Holley was at the October 2019 docket call, despite numerous tries to get Holley to come to the office through letters, e-mail, and phone calls. Holley had even made an appointment but then stood up his counsel and, according to his counsel, "H[olley] will not talk to us whatsoever." Although Holley's counsel had sent summaries of the State's filings to Holley, Holley had refused to communicate with him about those filings.

During the continuance hearing, after contending that it would be impossible for him to be ready for trial if he could not talk to Holley, Holley's counsel also provided the trial court with the following information:

> . . . [Defense counsel]: So obviously, it's impossible for me to be ready for trial if I can't talk to my client. And [the prosecutor] has given me numerous, numerous documents, extremely well prepared, I might

add. And, of course, I can't inform him of them. I sent him summaries of stuff, but he won't talk to me. He won't talk to me.

So for that reason, it's impossible for me to be ready. And I also would like to put a couple of other things on the record if it pleases the Court.

THE COURT: Sure.

[Defense counsel]: [The prosecutor] had graciously offered me a reduction to noncontinuous, fifteen years TDC, that I tried diligently to get my client to take, and he would not do it.

And then also, I had previously filed a motion to suppress a confession. But at the time when I filed that, I thought that the Defendant was arrested at the time that he had made the confession [to Deputy Buford]. But I determined later on that he was not arrested until the next day.

So quite frankly, the motion in my mind was no longer good. And I've waived that right, waived the motion. I don't want to waste the Court's time on a frivolous motion.

The prosecutor informed the trial court that Holley had a GPS monitor and asked the trial court to see if Holley would appear at the next docket call, in two days' time, which would give Holley's counsel the opportunity to speak with him. She further stated that the case should advance to trial for M.R.'s benefit, asserting, "This case is getting old. And my victim has a right to have this case presented and has a right for this case to move. And we would ask for the Court to deny the motion for continuance and see if he shows up at docket call."

The trial court denied the motion, stating,

I do not want to continue this case again. So I'm going to deny the motion for continuance. So I want to see if he shows up on Friday[, at

21

the January 17 docket call]. He knows he's supposed to. If he doesn't, his bond will be held insufficient, and we'll gain his appearance another way.

Holley failed to appear at the docket call on January 17, 2020, forfeiting his bond, and resulting in the issuance of a warrant for his arrest. He was arrested three days later.

Defense counsel's billing records for Holley's case, which are contained in the clerk's record, show that he visited the jail on January 21, 2020, for 1.5 hours, and on January 23, 2020, for an hour.

### 3. Counsel's Performance During Trial

On January 27, 2020, before voir dire began, Holley's counsel renewed his motion for continuance based on the same facts he had presented earlier, and the trial court again denied the motion.

During voir dire, Holley's counsel reminded the venire panel that they needed jurors who could be fair and impartial and decide without bias or prejudice, that there was a presumption of innocence, and that "there are a lot of people who aren't guilty . . . sitting in prison for things they didn't do."

During M.R.'s direct examination, Holley's counsel raised objections to leading and to the prejudicial value outweighing the probity of State's Exhibits 2 and 3, which were diagrams of the male and female bodies upon which M.R. circled where Holley had hurt her and with what. The trial court sustained at least one of the objections to leading during M.R.'s testimony.

We have already discussed Holley's counsel's efforts to identify the school counselor as the sole outcry witness, to keep out the forensic interviewer's outcry testimony, to keep out the evidence of flight, and to prevent the State from asking Holley and his brother about Holley's alleged bad act. He also sought to keep out a screenshot photo of M.R. that was taken during her April 2018 forensic interview,[9] but the trial court overruled that objection.

Holley's counsel objected to hearsay during the testimony of a CPS worker about identifying Holley as the perpetrator of M.R.'s sexual abuse claim, and he raised hearsay and other objections during Deputy Buford's testimony about Holley's admissions and hearsay objections to the medical records admitted during the SANE nurse's testimony. Holley's counsel also objected to M.R.'s adopted mother's testimony about what M.R.'s demeanor was like when she moved in with her adopted mother as irrelevant and immaterial, and the trial court sustained that objection. After conferring with Holley's counsel, the prosecutor stated that they would stipulate that no DNA was found in the swabs taken during M.R.'s medical exam. There was no trauma to M.R.'s body noted by the SANE nurse, and the lack of any physical evidence made this case into a "he-said, she-said" case turning on credibility.

---

[9]Holley's counsel argued that the probative value of the photo of the then-11-year-old child, who was sitting in an armchair in the interview room and who was so tiny that her feet did not reach the floor, was outweighed by its prejudicial impact.

Additionally, as pointed out by the State, defense counsel's hourly records reflect that he conferred with Holley on January 28, 2020, and on January 29, 2020, the two days of the guilt-innocence phase of trial, and that he spent a total of 221.48 hours working on Holley's case.

The record reflects that Holley opted not to remain in contact with his counsel before trial despite counsel's efforts to keep Holley informed. Holley opted not to take the 15-year plea offer from the State. Holley said "yes" and opted to take the stand in his own defense after the trial court asked him, "[A]fter having had opportunities to confer with . . . your counsel, is it still your decision that you wish to testify in front of this jury?" Taking the stand allowed the jury to fully assess Holley's credibility in light of his prior recorded admissions that he voluntarily made before counsel was appointed for him, and during cross-examination, he gave the following testimony:

> Q. . . . Do you recall telling [Deputy] Buford things that [M.R.] did before and after these acts of sexual abuse?
>
> A. Yes, ma'am.
>
> Q. Where it happened?
>
> A. Yes.
>
> Q. And exactly how it happened, correct?
>
> A. Yes.
>
> Q. Would you agree with me that that is very detailed accounts of what happened to [M.R.] and you in that house in Sanger?

24

A. I believe so.

Q. You actually gave more information than [M.R.] did in her forensic [interview], fair?

A. Yes, ma'am.

During closing arguments, Holley's counsel focused on the fact that there was no DNA or other physical evidence to support convicting Holley.

### 4. Conclusion

Based on the record before us, we cannot say that the trial court abused its discretion by denying Holley's motion for continuance on the basis of ineffective-assistance (or for any other reason) because Holley was ably represented by counsel, *see Gonzales*, 304 S.W.3d at 842–43; *Windham*, 634 S.W.2d at 719–20, notwithstanding Holley's own actions that undermined his case and allowed the jury to fully assess his credibility. Accordingly, we overrule Holley's fourth issue.

Further, the jurors heard Holley's interview with Deputy Buford, in which Holley confessed to having committed continuous sexual abuse of a child with M.R., and they were entitled to believe what Holley said in the interview and to disbelieve his later denial. Given the strength of his confession, we cannot say that the admission of the evidence above or the lack of a continuance would have caused the jury to reach a different verdict. Therefore, because no harm is shown on this record, we likewise overrule Holley's unnumbered complaint about cumulative harm.

### III. Conclusion

Having overruled all of Holley's issues, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: May 13, 2021